*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2009**

In the Matter of the Welfare of the
Children of: S. E. N. and R. D. J., Jr., Parents.

**Filed May 23, 2016
Affirmed
Jesson, Judge**

Nobles County District Court
File No. 53-JV-15-95

Kathleen A. Kusz, Nobles County Attorney, Adam E. Johnson, Assistant County Attorney, Worthington, Minnesota (for respondent county)

Steven R. Forrest, Hedeen, Hughes & Wetering, Worthington, Minnesota (for appellant-mother S.E.N.)

Kayla Johnson, Smith & Johnson, Slayton, Minnesota (for respondent-father R.D.J., Jr.)

Thomas Joseph Nolan, Jr., Nolan Law Offices, Minneapolis, Minnesota (for guardian ad litem)

Considered and decided by Jesson, Presiding Judge; Reilly, Judge; and Toussaint, Judge.[*]

**U N P U B L I S H E D   O P I N I O N**

**JESSON**, Judge

Appellant-mother S.E.N. argues that the district court abused its discretion by terminating her parental rights on the grounds that (1) the county failed to make

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

reasonable efforts to reunite the family and (2) the conditions leading to the children's out-of-home placement have not been corrected. She also argues that the district court abused its discretion by admitting evidence of a parenting-capacity assessment and taking judicial notice of evidence from a prior child-protection proceeding. We affirm.[1]

## FACTS

S.E.N. is the mother of three children, ages 8, 7, and 5. S.E.N. has a history of chemical-dependency and mental-health challenges. Her interaction with the child-protection system began in 2011, when Steele County Human Services filed a child-in-need-of-protective-services (CHIPS) petition after she failed to care for the children on two occasions, including once leaving them unattended while she went out drinking. The children were taken into protective custody and placed in foster care with their maternal grandparents.

In 2012, S.E.N. had a drug overdose, which was an apparent suicide attempt, and was treated at a psychiatric hospital in Rochester. She received chemical-dependency treatment, individual therapy, and family therapy with her children at an inpatient program in Garden City. After she completed that program in September 2012, she went to live with her parents and children in Adrian, and in February 2013, the Steele County child-protection case was dismissed. In April 2013, while living at her parents' home, S.E.N. had a mental-health crisis and made a suicide attempt through an overdose of hypertension medication.

---

[1] The children's father, R.D.J, Jr., does not appeal the district court's termination of his parental rights.

S.E.N. moved to Worthington with the children in July 2013 and was generally sober until November 2014. During this period of time, S.E.N. participated in dialectical behavioral therapy, which was designed to help her deal with intense emotions and impulsivity. She had received diagnoses including generalized anxiety disorder, alcohol dependence in remission, major depressive disorder-moderate, and features of personality disorder with dependent and borderline traits. Her therapist at that time believed that S.E.N. was making progress, but S.E.N. discontinued therapy in May 2014.

On November 8, 2014, S.E.N. was involved in a serious motor vehicle accident while driving under the influence of alcohol with the three children in her car. None of the children were buckled or otherwise secured in the car, and the youngest child sustained an injury to her head in the crash. S.E.N. was arrested, and the children were placed in the emergency custody of Nobles County Community Services (the county). Two days later, S.E.N. told an agency supervisor that she had made a mistake by drinking and that she was trying to kill herself and forgot that the children were in the car. In December 2014, S.E.N. admitted to a CHIPS petition filed by the county. The children were placed in relative foster care, and S.E.N. received a case plan, which required her to participate in mental-health services and parenting classes, have a parenting-capacity assessment, and maintain a period of sobriety.

Barbara Carlson, a licensed professional clinical counselor and alcohol and drug counselor, completed the parenting-capacity assessment. To do so, she conducted a personal interview, administered testing, and observed a parent-child visit. Based on information from this assessment, Carlson formed an opinion that S.E.N. had not been

3

providing a safe and stable environment for the children and that reunification was not in their best interests.

S.E.N. also received a rule-25 chemical-dependency assessment, and in February 2015, she successfully completed a 30-day inpatient dual chemical-dependency and mental-health program in St. Paul. She then moved to Faribault to live with her boyfriend of four years. She started to attend the Fountain Centers in Faribault for an aftercare intensive outpatient chemical-dependency-only program, but did not complete it because she stopped attending group sessions due to depression. Her prognosis at discharge was poor, with a moderate-to-high risk of relapse.

In March 2015, S.E.N. began attending weekly therapy sessions with another psychologist who diagnosed her with major depressive disorder and anxiety disorder. That psychologist believed that S.E.N. made progress in treatment and had the ability to parent while sober, but that she would need alcohol monitoring, parenting classes, insight into her mental health, and a support system rather than her current mode of crisis management, to assure stability for the children. The psychologist could not predict a timeline for S.E.N.'s stability.

In April 2015, S.E.N. was hospitalized with suicidal ideation, and the children's therapists wrote a joint letter recommending reduced visitation. In June 2015, the county filed a petition to terminate parental rights. The Nobles County CHIPS case manager indicated that, although S.E.N. was generally compliant with her case plan, she did not successfully complete aftercare, did not have stable mental health, and did not respond to efforts to keep in contact. The case manager was concerned because in the past S.E.N.'s

4

relapse and concurrent dangerous behavior came with little notice while she was receiving numerous services.

The children's guardian ad litem in Nobles County also recommended termination of parental rights based on the children's best interests. She cited the car accident, which had exposed them to grave danger, as well as several times when they were left home alone. The guardian ad litem opined that S.E.N. was just beginning to gain insight into her alcoholism and mental illness, but the children needed permanency now.

The district court conducted a trial and issued findings of fact, conclusions of law, and an order terminating the parental rights of both parents. The district court found that the children had spent 569 days in out-of-home placement and terminated S.E.N.'s parental rights on the following grounds: (1) that she had substantially, repeatedly, or continuously neglected to comply with the duties of the parent-child relationship, under Minn. Stat. § 260C.301, subd. 1(b)(2) (2014); (2) that she was palpably unfit to be a party to the parent-child relationship, under Minn. Stat. § 260C.301, subd. 1(b)(4) (2014); and (3) that following a determination of neglect or dependency, reasonable efforts under the court's direction had failed to correct the conditions leading to the determination, under Minn. Stat. § 260C.301, subd. 1(b)(5) (2014).

S.E.N. moved for amended findings or a new trial, arguing that the district court made insufficient findings on whether conditions leading to the determination had been corrected and whether the county had provided reasonable efforts. She also argued that the district court had improperly gone beyond the scope of judicial notice by admitting evidence of her circumstances in the Steele County CHIPS case and that Carlson's

parenting-capacity assessment and testimony lacked foundation from which to draw conclusions regarding S.E.N.'s parental capabilities. The district court denied the motion, and S.E.N. appeals.

## D E C I S I O N

A district court may terminate parental rights if clear and convincing evidence establishes at least one statutory ground for termination and if termination is in the child's best interests. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). On appeal, this court reviews the district court's findings of fact for clear error. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). But we review the ultimate determination that the findings fit the statutory criteria for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 17, 2012).

S.E.N. does not expressly challenge the district court's termination of her parental rights on the grounds of failure to comply with the duties of the parent-child relationship and palpable unfitness as a parent. But she argues that the county did not engage in reasonable reunification efforts, which are required for termination of parental rights. *See In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005) (requiring clear and convincing evidence of reasonable efforts to support termination). She also argues that the district court erred by terminating parental rights on the ground that conditions

leading to the out-of-home placement were not corrected. And she argues that the district court abused its discretion by admitting the parenting-capacity assessment and evidence of events that occurred during the prior Steele County CHIPS proceeding.

## I

In every termination-of-parental-rights proceeding, the district court must make specific findings that the county made reasonable efforts to rehabilitate the parent and reunite the family. Minn. Stat. § 260C.301, subd. 8 (2014); *see also* Minn. Stat. § 260.012(a) (2014) (requiring reasonable reunification efforts in child-protection cases, absent certain exceptions not at issue here). "[T]he provision of reasonable efforts must be evaluated by the court in every case." *T.R.*, 750 N.W.2d at 664 (quotation omitted). In determining whether efforts were reasonable, a district court considers whether the services provided were (1) relevant to the child's safety and protection; (2) adequate to meet the child's and family's needs; (3) culturally appropriate; (4) available and accessible; (5) timely and consistent; and (6) realistic under the circumstances. Minn. Stat. § 260.012(h) (2014). The district court also considers the quality of the county's effort and the length of time the county was involved with the family. *In re Welfare of H.K.*, 455 N.W.2d 529, 532 (Minn. App. 1990), *review denied* (Minn. July 6, 1990). "Reasonable efforts" at rehabilitation must "go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Mar. 28, 2007). But reasonable efforts does not require extraordinary or exhaustive efforts. *See In re Welfare of S.Z.*, 547 N.W.2d 886, 892-93 (Minn. 1996) (stating that "reasonable efforts" did not

7

require services that were unlikely to "bring about lasting parental adjustment enabling the placement of [the child] with [the parent] within a reasonable period of time").[2]

The district court found that the county had provided a number of services to S.E.N., including inpatient and outpatient dual-diagnosis chemical-dependency and mental-health programming, individual mental-health therapy, financial and transportation assistance, and supervised visitation. It also found that the children received a significant number of services, including individual therapy, medical and dental care, community activities, and in-home daycare. These findings are not clearly erroneous.

In addition to reasonable efforts toward reunification, a social services agency is required to seek permanency for children in foster care within statutory guidelines. A permanency progress review is required within six months after a child has been placed in foster care. Minn. Stat. § 260C.204 (2014). And generally, a district court must commence permanency proceedings no later than 12 months after a child is placed in foster care or the care of a non-custodial parent. Minn. Stat. § 260C.503 (2014). S.E.N. argues that, despite offering services to her, the county failed to provide services to improve her circumstances, but rather "took active steps to create inertia" towards a desired result of terminating her parental rights. Specifically, she points to the therapists' April 2015 letter recommending reduced visitation and the case manager's June 2015 e-

---

[2] The county is not asserting that the presumption applies that reasonable efforts have failed because of a parent's chemical dependency and failure of treatment under Minn. Stat. § 260C.301, subd. 1(b)(5).

mail to an adoption counselor, stating that she did not know if she could "get away" with further reducing parental contact.

But by April, the district court had already held a review hearing, at which the children's guardian ad litem had submitted reports recommending to the district court that a permanency petition be filed in 30 days in connection with the county's obligation to conduct concurrent permanency planning. At a review hearing in March 2015, the district court ordered supervised visitation to continue, but also ordered the county to conduct permanency planning. After another review hearing in April, the district court continued to recommend services, but found that the children had been in out-of-home placement for 388 days, which was past permanency deadlines, and ordered a permanency petition to be filed. Thus, at the time of the psychologists' April letter and the county's June e-mail, the county was seeking the children's permanent placement as required by statute.

Minnesota law requires reasonable efforts at reunification, not every conceivable effort. Given the lengthy time these children were in out-of-home placement, the county's efforts were more than reasonable. We therefore reject S.E.N.'s argument and conclude that clear and convincing evidence supports the determination that the county made reasonable efforts at reunification.

## II

S.E.N. challenges the district court's determination that the conditions which led to the out-of-home placement failed to be corrected. Parental rights may be terminated if, "following the child's placement out of the home, reasonable efforts, under the direction

9

of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). To terminate parental rights, the district court must find clear and convincing evidence that the conditions existing at the time of the trial will continue for a prolonged indeterminate period. *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn. 2001).

Even if a parent has substantially complied with the terms of a case plan, a district court may still find a statutory basis to terminate parental rights when the record contains clear and convincing evidence supporting termination. *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 89 (Minn. App. 2012). "The critical issue is not whether the parent formally complied with the case plan, but rather whether the parent is presently able to assume the responsibilities of caring for the child." *Id.*

The district court found that, although S.E.N. had substantially complied with some parts of her case plan, the conditions that led to the children's removal from the home—her dual diagnoses of mental-health and chemical-dependency issues, which led to the children's neglect—have not been corrected. S.E.N. argues that, at the time of trial, she was sober and had the basic skills to maintain sobriety and her mental health. She maintains that her personal therapist's testimony that she was capable of further progress supports a conclusion that her mental-health and chemical-dependency issues were not likely to continue for a prolonged period.

But the record shows that, while S.E.N. was making some progress in addressing these issues, she was still fragile. Her counselor at the Fountain Centers testified that she was unable to complete that program because of her mental-health concerns, and he gave

10

her a poor prognosis. Barbara Carlson testified that, during a visitation session with the children, S.E.N. was unable to handle the children's comments about the car accident and left the room crying, causing the children anxiety. And S.E.N.'s treating therapist testified that for reunification to occur, S.E.N. would need to develop better support systems. Further, S.E.N. has not demonstrated insight into her need for additional assistance: she testified that she did not need further chemical-dependency treatment because she was sober at the time of trial. We conclude that clear and convincing evidence supports the district court's determination that the statutory requirement that S.E.N. failed to correct conditions leading to the out-of-home placement was met.

### III

S.E.N. argues that the district court abused its discretion by admitting Carlson's testimony and parenting-capacity assessment because it amounted to a novel scientific theory and lacked foundational reliability. The district court has broad discretion in deciding whether to admit evidence, and we will not disturb that ruling unless it amounts to an abuse of discretion. *J.K.T.*, 814 N.W.2d at 93.

If expert evidence involves a "novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community." Minn. R. Evid. 702. The district court generally holds a hearing to examine this issue. *State v. Edstrom*, 792 N.W.2d 105, 109 (Minn. App. 2010). In denying S.E.N.'s posttrial motions, the district court found that Carlson's opinion and testimony had sufficient foundation and did not reflect a novel scientific theory. We agree. In reporting to the court in juvenile-protection matters, social services agencies

11

> may submit written information from collateral sources, including, but not limited to, physical and mental health assessments, parenting assessments, or information about the delivery of services or any other relevant information regarding the child's safety, health, or welfare in support of the report or as a supplement to the report.

Minn. R. Juv. Prot. P. 38.01, subd. 7. Parenting assessments are commonly used by social services agencies when termination of parental rights is being considered. *See, e.g.*, *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 129 (Minn. 2014) (noting, in proceeding to terminate parental rights, that parents' case plan required following recommendations made after parenting assessments). Therefore, the use of parenting assessments is authorized by the rules of juvenile protection procedure and is not considered a novel scientific theory.

When expert testimony is not based on novel scientific evidence, it must be shown to "be relevant, be given by a witness qualified as an expert, and be helpful to the trier of fact." *Goeb v. Theraldson*, 615 N.W.2d 800, 814 (Minn. 2000). An expert's opinion is helpful if it provides "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. Current literature suggests that, in conducting forensic evaluations in child-protection matters, best practice dictates that professionals use appropriate and relevant methods of data collection, conduct appropriate testing, and support clinical interpretations and recommendations with data gathered and presented in their reports. Antoinette Kavanaugh, et al., *Obtaining and Utilizing Comprehensive Forensic Evaluations: The Applicability of One Clinic's Model*, 6 Nev. L. J. 890, 893-94 (2006).

12

Here, Carlson conducted the parenting-capacity assessment in accordance with professional standards, using instruments such as the parenting stress index and a domestic-violence inventory. *See id*. at 912. It therefore meets the standards of rule 702. S.E.N. argues that, although Carlson was making psychological diagnoses, she was not a licensed psychologist. But Carlson's report contained an addendum that was co-signed by a licensed psychologist. The district court did not abuse its discretion by admitting the parenting-capacity assessment.

## IV

S.E.N. argues that the district court abused its discretion by going beyond the scope of judicial notice when it admitted evidence of the court file in the Steele County CHIPS matter, including reports filed by the guardian ad litem in that case. The Minnesota Rules of Evidence allow the district court to take judicial notice of adjudicative facts in civil cases if those facts are "not subject to reasonable dispute" because they are either "generally known within the territorial jurisdiction of the trial court or" they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Minn. R. Evid. 201(b). Thus, a district court may not take judicial notice of testimony from a previous proceeding because that testimony is a matter in dispute. *In re Zemple*, 489 N.W.2d 818, 820 (Minn. App. 1992). Specifically, in juvenile protection proceedings, "[i]n addition to the judicial notice permitted under the Rules of Evidence," the district court "may take judicial notice only of findings of fact and court orders in the juvenile protection court file and in any

other proceeding in any other court file involving the child or the child's parent or legal custodian." Minn. R. Juv. Prot. P. 3.02, subd 3.

A new trial based on improper evidentiary rulings is available only if the complaining party demonstrates prejudicial error, and "[a]n evidentiary error is not prejudicial if the record contains other evidence that is sufficient to support the findings." *J.K.T.*, 814 N.W.2d at 93. To the extent that the district court's factual findings in the Steele County CHIPS proceeding contained the guardian ad litem's reports from that case, the district court did not abuse its discretion by taking judicial notice of them. But to the extent that such reports were not part of those findings, their admission in this case amounted to harmless error. The guardian ad item who wrote the reports testified in this matter and was subject to cross-examination. And even without the reports, the record contains evidence sufficiently supporting the district court's termination of S.E.N.'s parental rights. *See In re Welfare of D.J.N.*, 568 N.W.2d 170, 175-76 (Minn. App. 1997) (holding that, although "[i]t was a mistake for the trial court . . . to take judicial notice of the entire [previous juvenile-protection] files," because that appellant failed to show prejudice, there was no reversible error). S.E.N. has failed to demonstrate prejudice from the admission of the reports, and she is not entitled to relief.

## V

Finally, we note that S.E.N. has not challenged the district court's determination that the children's best interests would be served by termination of her parental rights. "[T]he best interests of the child must be the paramount consideration" in a proceeding to terminate parental rights. Minn. Stat. § 260C.301, subd. 7 (2014). The district court

14

balances the child's and parent's interests in preserving the parent-and-child relationship with any competing interests of the child, such as a stable environment and health considerations. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3); *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992).

Here, the district court made best-interests findings regarding each of the three children. It found that the children had immediate needs for permanent, consistent, emotionally stable caregivers, which would best be served by adoption, rather than waiting an unforeseeable length of time for S.E.N. to acquire the skills necessary to meet their needs. "Each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home . . . ." *In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn. 2003). Although S.E.N. was sober at the time of trial, she has not demonstrated that she is able to sustain the day-in and day-out tasks of parenting three children, and her therapist testified that she "can't really predict a timeline" for her stability.

After 569 days in out of home placement, it was time for these children to have a permanent home and family. Because the record supports the district court's findings, the district court did not abuse its discretion by concluding that the termination of S.E.N.'s parental rights is in the children's best interests.

**Affirmed.**